[Cite as *State v. Young*, 2011-Ohio-2646.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO.   09 MA 100 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | O P I N I O N |
| | ) | |
| CURTIS YOUNG, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |


CHARACTER OF PROCEEDINGS:          Criminal Appeal from Common Pleas
                                                            Court, Case No. 07CR1000.


JUDGMENT:                                           Affirmed in part; Reversed and Remanded
                                                            in part.


APPEARANCES:
For Plaintiff-Appellee:                           Attorney Paul Gains
                                                            Prosecuting Attorney
                                                            Attorney Ralph Rivera
                                                            Assistant Prosecuting Attorney
                                                            21 West Boardman Street, 6th Floor
                                                            Youngstown, Ohio  44503


For Defendant-Appellant:                     Attorney John Laczko
                                                            3685 Stutz Drive, Suite 100
                                                            Canfield, Ohio  44406


JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Mary DeGenaro

                                                            Dated:  May 25, 2011

VUKOVICH, J.

¶{1}  Defendant-appellant Curtis Young appeals after being convicted of multiple counts of aggravated murder and sentenced to life without the possibility of parole by the Mahoning County Common Pleas Court.  Appellant first claims that he should not have been tried for two counts which referred to the same fetus and that convicting him for the aggravated murder of this fetus violated his Equal Protection rights because an individual who performs an abortion on a viable fetus is only charged with a fourth degree felony.  Appellant then argues that the court should not have allowed the entire videotaped statement of the victim's daughter to be played where the defense only wished to play a portion of it to impeach one of her answers on cross-examination.  Appellant alleges there were various instances of prosecutorial misconduct that require a new trial.  Appellant also contends that the finding of prior calculation and design and the failure to find that he acted in self-defense were decisions that were contrary to the manifest weight of the evidence.  These arguments are all without merit.

¶{2}  Appellant's final argument is that the court erred in attempting to impose post-release control for unclassified felony offenses.  The state concedes this error. As we are remanding for a new sentencing entry that deletes post-release control, we have decided to recognize plain error and include in this remand instructions for the trial court to correct its error in imposing a sentence on each of the two merged counts. That is, at a new sentencing hearing the state must choose which of the two merged counts it wishes the court to enter a sentence on and the trial court must enter a sentence on only one of the two merged counts.

<u>STATEMENT OF THE CASE</u>

¶{3}  On July 31, 2007, appellant shot Helen Moore in the neck, killing her instantly as she sat in her vehicle in front of his house in Youngstown, Ohio.  The bullet then traveled into the skull of her eight-year-old son, who died in the hospital. Helen was also pregnant at the time and was only days from her due date.  The fetus, weighing over seven pounds, was terminated by Helen's death.

¶{4}  Appellant was indicted on four counts of aggravated murder with death and firearm specifications.  Count one entailed purposely and with prior calculation and design causing the death of Helen Moore in violation of R.C. 2903.01(A).  Count

two alleged that appellant purposely and with prior calculation and design caused the unlawful termination of Helen's pregnancy in violation of R.C. 2903.01(A). Count three alleged that appellant purposely caused the death of a child under thirteen in violation of R.C. 2903.01(C), referring to Helen's unborn child. Count four entailed purposely causing the death of Helen's son, a child under thirteen, in violation of R.C. 2903.01(C).

¶{5} At trial, the parties stipulated that Helen and appellant had an intermittent relationship from 2001 through the date of the incident and that the relationship was fraught with physical and verbal abuse by both parties. (Tr. 610). Helen's daughter, who was eleven years old and riding in the backseat of her mother's vehicle at the time of the incident, testified. She stated that Helen hung up on appellant each time he called her that morning. (Tr. 482). Appellant then came to their house and started to argue with Helen. (Tr. 480).

¶{6} The daughter testified that appellant drove away, Helen followed him, and both parties were trying to hit each other's vehicles. (Tr. 485). She used her cellular telephone to report where they were traveling to her aunt, who was following them. (Tr. 486-487). Her aunt kept telling her to beg her mother to stop. (Tr. 512-513). They followed appellant to a convenience store, then to a shopping plaza (where her mother attempted to block appellant's vehicle), and then to his house. (Tr. 487, 508, 510).

¶{7} She stated that her mother parked in front of appellant's house, and appellant ran into his house momentarily. (Tr. 490-492). He then ran out of the house to their vehicle with something in his hand; as he approached the car, she noticed that he was holding a gun. (Tr. 493-494). She testified that appellant came to the front side of the car, argued with her mother briefly while pointing the gun at her, and then shot her. (Tr. 497). The car then rolled off the road, hit a tree, and flipped over on its side. (Tr. 499-500).

¶{8} A portion of the child's statement to police immediately after the incident related that her mother tried to run appellant over. (Tr. 518, 524). She clarified at trial that because appellant was on the side of the vehicle by her mother's window when he fired the shot, her mother could not have actually run him over. (Tr. 527, 529).

¶{9}  Helen Moore's nephew, who was fourteen at the time, testified that he was in a car waiting for Helen when appellant approached and started arguing about Helen not answering his calls.  The nephew heard appellant say, "I'm going to slap you, I'm going to shoot you, I don't care about that baby."  He testified that appellant tried to hit his aunt but missed and hit his mother instead.  (Tr. 548).  The vehicle he was in then followed Helen as she followed appellant.  He stated that his mother and Helen tried to block appellant in at the shopping plaza because the police were on their way.  (Tr. 550).  The nephew heard appellant on his phone telling someone to get his gun.  (Tr. 554).  When they arrived at appellant's house, he saw appellant run to his house and retrieve a shiny object from his girlfriend.  (Tr. 560).  He watched appellant approach Helen's vehicle and pull a gun out from his shirt.  (Tr. 561).  He heard a gunshot and then saw Helen's vehicle roll into the trees.  (Tr. 562).

¶{10} Helen Moore's sister testified that she was present when appellant initially arrived at her sister's house.  She heard appellant threatening "to kill her, everybody, and he going to F her up * * *."  (Tr. 607).  The sister testified that she got a crowbar out of her trunk to protect Helen as it appeared that appellant was about to hit her.  (Tr. 608, 611).  She told Helen to get in the car and could not discern if appellant ended up striking her.  (Tr. 611).  The sister testified that as Helen pulled away, appellant tried to hit her vehicle with his vehicle.  (Tr. 612).

¶{11}  The sister stated that appellant then followed her sister's vehicle and she followed both vehicles.  (Tr. 613).  The sister was on the phone with 911 for twenty-minutes, and the tape was played to the jury.  Once at the shopping plaza, she heard appellant tell someone on his phone to get his gun because he was about to kill someone.  (Tr. 616).  The time on the 911 call that she reported this to dispatch coincided with the time appellant's phone records show that he called his girlfriend.  (Tr. 777).  When the sister arrived at appellant's house, she saw appellant standing in the street watching Helen's vehicle roll into the tress.  (Tr. 626-627).

¶{12}  An officer testified that Helen's sister told her that appellant had threatened, "I'll kill you and your damn kids."  (Tr. 688).  A witness from the shopping plaza testified to watching the argument.  She stated that appellant could have driven away and that as Helen walked away, it appeared he kept antagonizing her and causing her to turn back to the argument.  (Tr. 861-862).

¶{13} Appellant then testified in his own defense. He stated that he argued with Helen at her house and then drove to the convenience store where Helen and her sister blocked his vehicle in, requiring him to drive over a curb. (Tr. 888-889). A defense witness, who came forward just prior to trial, confirmed this. (Tr. 866, 870). Appellant testified that Helen then pulled in front of him requiring him to drive around her vehicle. He said that when he stopped at the shopping plaza, Helen approached him yelling. (Tr. 890-891). He denied telling anyone on his phone to get his gun. (Tr. 923). In fact, he testified that he had the gun on him all day. (Tr. 901).

¶{14} Appellant testified that after a few minutes at the shopping plaza, he drove home with Helen following him. (Tr. 892, 896). He did not believe that she was trying to hit his vehicle. (Tr. 933). Appellant testified that upon arriving at home, he entered the house for a moment to see if his girlfriend was ready to leave. (Tr. 897-898). He said that he walked to the middle of the street to tell Helen to leave but she stepped on the gas and tried to run him over. (Tr. 899). He said he started to run, pulled his gun out, and fired a shot behind him. (Tr. 901, 929). He then left the scene and turned himself in some days later.

¶{15} A jury found appellant guilty of all four counts of aggravated murder with their attendant death and gun specifications. Counts two and three were merged as were the gun specifications. After the mitigation hearing, the jury recommended life without the possibility of parole, and the court concurred in imposing this sentence plus three years for the remaining gun specification. Appellant filed a timely notice of appeal from the court's May 22, 2009 sentencing entry.

### ASSIGNMENT OF ERROR NUMBER ONE

¶{16} Appellant's first assignment of error contends:

¶{17} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY OVERRULING HIS MOTIONS TO DISMISS COUNTS TWO (2) AND THREE (3) OF THE INDICTMENT REFERRING TO DEATH OF THE UNBORN CHILD."

¶{18} Counts two and three both referred to Helen's unborn child. Count two alleged that appellant purposely and with prior calculation and design caused the unlawful termination of Helen's pregnancy in violation of division (A) of R.C. 2903.01. The aggravated murder in count three deals with division (C) of R.C. 2903.01, which

states that no person shall purposely cause the death of another who is under thirteen years of age.

¶{19} Initially, appellant generally argues that he was prejudiced by having to defend against two different aggravated murder counts for the same victim. He then more specifically argues that he should have only been charged with count two because it is more precise than count three as it deals with an unborn child whereas count three deals with an actual child. This coincides with the arguments within his April 10, 2009 motion to dismiss count three.

¶{20} Appellant cites R.C. 1.51 in support of his preciseness argument. Yet, that statute only refers to situations where a general provision *conflicts* with a special or local provision. Here, there is no conflict between the divisions; nor is one division more precise. For purposes of criminal offenses, a person (including the person who is killed in an R.C. 2903.10(C) offense) includes an unborn human who is viable. R.C. 2901.01(B)(1)(a)(ii). Viable is then defined as the stage of development of a human fetus at which there is a realistic possibility of maintaining and nourishing a life outside the womb with or without temporary artificial life-sustaining support. R.C. 2901.01(B)(1)(c)(ii). The defense did not contest viability in its dismissal motions as the baby weighed over seven pounds and was due in a matter of days. Thus, count two is not more precise than count three[1], and both counts are applicable to the situation at bar. See *State v. Chippendale* (1990), 52 Ohio St.3d 118, 122-123 (where there is no manifest legislative intent that one offense apply over another, the state can try the defendant for two offenses and the court will merge the offenses at sentencing).

¶{21} Along these lines, it should be pointed out that the Double Jeopardy Clause prohibits multiple *punishments* for the same offense. Fifth Amendment, United States Constitution; Section 10, Article I, Ohio Constitution. Allied offenses of similar import are subject to this same prohibition. R.C. 2941.25. However, it is the imposition of more than one sentence, not the trial by a jury on all offenses, that is barred. A defendant can be tried for all offenses that his conduct encompasses. *State*

---

[1]Notably, if a jury found the fetus was not viable, then count three would not be established as the definition of person requires a viable fetus, whereas count two does not require the fetus to be viable in order to establish that type of aggravated murder.

*v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶17.  See, also, R.C. 2941.04.  Thus, the trial court was not required to dismiss count three prior to trial.

¶{22} Appellant's next argument coincides with another motion to dismiss filed before trial, wherein he argued that both counts two and three should be dismissed. Specifically, he argues that charging him with aggravated murder for the death of an unborn child is an Equal Protection violation, alleging that those charged under R.C. 2919.17, the unlawful abortion statute, are similarly situated defendants but are only subject to the maximum penalty of a fourth-degree felony.  See R.C. 2919.17(D).

¶{23} There is a presumption that statutes are constitutional, and the challenger has the burden to establish a statute's interaction with another statute is unconstitutional.  *State v. Gill* (1992), 63 Ohio St.3d 53, 55.  The Equal Protection clause does not prevent all classifications; it merely prohibits laws from treating persons differently when they are alike in all relevant respects.  *Huntington Natl. Bank v. Limbach* (1994), 71 Ohio St.3d 261, 262.  Statutes that do not discriminate based upon a "suspect classification" and do not deprive a certain class of individuals of a fundamental right must only be rationally related to some legitimate government interest.  *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 289.

¶{24} As aforementioned, R.C. 2919.17 deals with the offense of terminating a human pregnancy after viability.  Division (A) provides that no person shall purposely perform or induce or attempt to perform or induce an abortion upon a pregnant woman if the unborn human is viable, unless two exceptions dealing with physicians apply.

¶{25} The definition statute referenced supra provides that the word "person" shall not be construed so that an offense prohibits any pregnant woman or her physician from performing an abortion with the consent of the pregnant woman, with the consent of the pregnant woman implied by law in a medical emergency, or with the approval of one otherwise authorized by law to consent to medical treatment on behalf of the pregnant woman.  R.C. 2901.01(B)(2)(a).  The statute continues by stating that an abortion that violates any of these terms can be punished under R.C. 2903.01 (the aggravated murder statute) if applicable.  Id.  An abortion that does not violate any of these terms but violates R.C. 2919.17, for instance, may be punished as a violation of R.C. 2919.17.  Id.  See, also, R.C. 2903.09(C)(1).

¶{26} Firstly, it is unlikely that appellant's act of shooting a pregnant woman in the neck would be categorized as the performance or inducement of an abortion just because the defendant is charged with aggravated murder which entails the unlawful and purposeful termination of a pregnancy with prior calculation and design. Even if appellant's conduct could be considered an "abortion," the statute provides that he is to be charged with R.C. 2903.01 where the terms in R.C. 2901.01(B)(2)(a) are violated.

¶{27} Contrary to appellant's suggestion, a person who performs a non-consensual, non-medical abortion of a viable fetus (a comparable defendant) can be charged with aggravated murder and cannot be charged with R.C. 2919.17. See R.C. 2909.01(B)(2)(a).[2] Therefore, the comparable defendant that appellant utilizes to support his argument would be treated the same as he was which negates any equal protection concerns. Thus, this argument is overruled.

¶{28} In any event, even if appellant could have been charged with a violation of R.C. 2919.17 regarding the lost fetus, the prosecutor has charging discretion. *United States v. Batchelder* (1979), 442 U.S. 114, 123-124. That is, when a criminal act violates more than one statute, the prosecutor can chose the offense with the greater punishment as long as he does not discriminate against a class of defendants. Id. To raise an Equal Protection challenge regarding prosecutorial selectivity, the defendant must allege that the choice of offense was motivated by improper considerations such as race, religion, or other arbitrary classification. Id. at 125, fn.9, citing *Oyler v. Boles* (1962), 368 U.S. 448, 456. Here, there is no actual class of defendants alleged to have been chosen by the prosecutor to receive the higher charge and no allegations of improper considerations. For all of these reasons, appellant's argument is without merit.

¶{29} Appellant's last argument under this assignment is difficult to understand. He reiterates that he was prejudiced by the existence of both counts concerning the

---

[2]Appellant does not state that he is similarly situated with a physician who performs an abortion of a viable fetus without a medical reason or without consent. See *State v. Moore* (Oct. 30, 1998), 2d Dist. No. 97CA137 (where the Second District concluded that charging violent offenders who purposely terminate a pregnancy with aggravated murder is rationally related to a legitimate government interest and that there is no Equal Protection violation by treating the defendant different than a physician or a pregnant woman); *State v. Coleman* (1997), 124 Ohio App.3d 78, 81 (constitutional to treat physician performing unlawful abortion different from violent offender). In fact, a physician who performs an abortion under certain circumstances is prosecuted for aggravated murder instead of a violation of R.C. 2919.17. See R.C. 2909.01(B)(2)(a).

fetus. This argument was addressed above, where it was pointed out that multiple pertinent counts can exist at trial as merger after trial is the only right of the defendant. Combined with this contention, appellant states that the addition of a charge which will be merged later is even more prejudicial in capital cases where additional death specifications will exist. However, there is no separate rule in capital cases that requires the state to elect which charge to proceed on before trial. See *State v. Jenkins* (1984), 16 Ohio St.3d 164, 195 (the presentation of overlapping aggravating circumstances at the guilt phase of a capital trial is allowable).

¶{30} Appellant's argument here becomes even more unclear when considering that he also briefly contends, without explanation, that neither count two or three could support a death specification on its own. It seems he may be attempting to argue that the jury could use the fetus twice to find him guilty of the death specification which alleged that the offense was part of a course of conduct involving the purposeful killing or attempt to kill two or more persons. However, it is clear that the jury was aware that counts two and three involved the same fetus. Regardless, the jury found him guilty of this death specification on count one (corresponding to Helen) and count four (corresponding to the eight-year-old child) as well. Thus, the existence of counts two and three did not factor into the jury's decision to convict him of this death specification. This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER TWO

¶{31} Appellant's second assignment of error alleges:

¶{32} "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT BY REQUIRING, AT THE INSISTENCE OF APPELLEE, THE ENTERING INTO EVIDENCE AND PLAYING OF THE VIDEOTAPE STATEMENT OF APPELLEE'S WITNESS [HELEN'S DAUGHTER, named omitted] IN ITS ENTIRETY FOR IMPEACHMENT PURPOSES OVER THE OBJECTION OF APPELLANT DURING TRIAL."

¶{33} On direct examination, Helen's daughter testified that the car was not moving when appellant ran to it and that it did not move until he fired the gun. (Tr. 498-499). On cross-examination, she stated that she did not remember making the following statement to police: "He ran out in front of the car and my mom tried to drove [sic] up and run him over." (Tr. 518). The defense then indicated that it would present

her videotaped interview, at which point the court asked if they would be playing the entire interview or just one portion. The defense stated, "Just the one portion at this point." The state objected arguing that impeachment requires a contradiction not a lack of memory. (Tr. 520). The defense then agreed to question her again to clarify whether she denied that she made the statement. The state concurred, adding that if she denies it, then the whole video must be played. The court agreed. (Tr. 521).

¶{34} Upon further questioning, the witness denied telling the detective that her mother tried to run appellant over. (Tr. 522). Defense counsel stated that he was going to play the video of the interview. The court stated, "Let the record reflect the defense counsel is going to play the entire interview." Defense counsel said, "Your Honor, what I would like to do is go to that portion, and if the state would like to play the entire thing –." The court responded, "No. Play the whole thing now." (Tr. 523).

¶{35} Appellant argues that only the portion of the interview that contained the prior inconsistent statement should have been played to the jury. He argues that by playing the whole statement, improper emphasis was placed on the witness's testimony as the jury ended up hearing her story twice.

¶{36} The subject matter of a prior inconsistent statement sought to be introduced through extrinsic evidence must be a fact that is of consequence to the determination of the action other than credibility. Evid.R. 613(B)(2)(a). When a party introduces part of a statement, the other party can require the introduction at that time of any other part of the statement that is otherwise admissible and which ought in fairness be considered contemporaneously with it. Evid.R. 106 (a "rule of timing"). Cf. Fed. Evid.R. 106 (which adopts a "rule of completeness" and does not require the remainder of the statement to be otherwise admissible). The question thus becomes whether the other parts of the interview, which were not inconsistent statements, were otherwise admissible or whether they were hearsay.

¶{37} A prior consistent statement is not hearsay if the declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive or the statement is one of identification of a person soon after perceiving the person, if the circumstances demonstrate the reliability of the prior identification. Evid.R.

801(D)(1)(b), (c). Here, part of the interview consisted of the child identifying appellant as the shooter, and thus, these parts are not hearsay. See Evid.R. 801(D)(1)(c). Moreover, one could conclude that the defense was implying that the child was fabricating parts of her story or that someone influenced her to say that the car did not move prior to the shot in order to ruin appellant's claim of self-defense. See Evid.R. 801(D)(1)(b). Thus, upon the defense's entry of part of it into evidence, the trial court could have rationally used its discretion to allow the interview into evidence in order to rehabilitate the witness. See id. See, also, Staff Note to Evid.R. 801(D)(1)(b) (1980).

¶{38} We also note the state's response that the content of the interview is admissible as a past recorded recollection. That is, a matter is not hearsay if it is:

¶{39} "A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown by the testimony of the witness to have been made or adopted when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party." Evid.R. 803(5).

¶{40} Notably, there is no limitation in this rule upon which parts of the memorandum can be read. See id.

¶{41} Appellant then argues that the interview should have been excluded under Evid.R. 403. This rule makes the exclusion of relevant evidence mandatory if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury and makes such exclusion discretionary if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence. Evid.R. 803(A), (B).

¶{42} There is no per se prejudice in presenting the remainder of an interview after presenting the prior inconsistent statement part of it where it merely recites testimony that the jury already heard. See *State v. Blanks* (Jan. 14, 1988), 8th Dist. No. 52543 (technical error in providing entire statement was not prejudicial where it did not provide jury with anything they had not already heard). The trial court could rationally find that the probative value of the interview was not substantially outweighed by unfair prejudice or by the needless presentation of cumulative evidence. See *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶62 (a

reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion).

¶{43} In any case, the defense did not object to playing the entire statement. (Tr. 521, 523, 524). When the state initially argued that the entire statement must be played, the defense voiced no opinion. (Tr. 521). When the court first announced that the entire statement would be played, the defense again voiced nothing to the contrary. (Tr. 521-522). In fact, in later voicing a preference as to timing, the defense essentially agreed that the state could play the remainder on redirect. (Tr. 523). As such, any error appears to be invited, and cannot be raised on appeal. *State v. Rohrbaugh*, 126 Ohio St.3d 421, 2010-Ohio-3286, ¶10 (even plain error is waived where the error is invited). See, also, *Lester v. Leuck* (1943), 142 Ohio St. 91, 92. For all of these reasons, this assignment of error is overruled.

## ASSIGNMENT OF ERROR NUMBER THREE

¶{44} Appellant's third assignment of error provides:

¶{45} "INSTANCE OF PROSECUTORIAL MISCONDUCT THROUGHOUT THE COURSE OF APPELLANT'S CRIMINAL TRIAL DEPRIVED HIM OF HIS RIGHT TO A FAIR TRIAL."

¶{46} In reviewing a prosecutor's alleged misconduct, the reviewing court considers whether the prosecutor's remarks were improper and whether those remarks affected substantial rights of the defendant. *State v. Smith* (1984), 14 Ohio St.3d 13, 14-15. Even if the remarks were improper, reversal is not warranted unless the conduct complained of deprived the defendant of a fair trial. *State v. Fears* (1999), 86 Ohio St.3d 329, 332. If in the context of the entire trial it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments, then the comments can be considered harmless. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶121. Moreover, the failure to object to prosecutorial misconduct waives all but plain error. *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, ¶77, 84.

¶{47} Appellant sets forth various allegations of prosecutorial misconduct. First, he claims that during voir dire, the prosecutor made reference to appellant's post-arrest silence. (Tr. 278-279). However, the statement contested here was a generic exploration of how a potential juror would view the credibility of a witness who did not

come forward when they had information. (Tr. 277-278). Specifically, the state used an example of a coworker sitting back while another coworker lost his job based upon an employer's mistaken belief. (Tr. 278). It was not a reference to the defendant. As the state argued in a sidebar, the witnesses it had in mind were appellant's girlfriend and a relative. (Tr. 280). The court then asked the state to use a different line of questioning to explore the topic. (Tr. 281). This is a rational response to the situation. There is no indication that appellant's substantial rights were affected by this innocuous question to an individual juror in voir dire.

¶{48} Appellant also takes issue with the prosecutor's attitude while questioning a defense witness regarding why the state was not informed of the witness until four days after the commencement of trial even though the witness apparently spoke with the defense "well before that * * *." (Tr. 871). During a sidebar where the court was questioning defense counsel about when he discovered the witness, the defense moved for a mistrial, relating that the prosecutor had acted like he was enraged at defense counsel by pointing his finger. (Tr. 875). The prosecutor urged that he was not pointing but was just motioning to the defense. (Tr. 876). The court stated to the jury: "[O]n behalf of the attorneys, I am going to apologize for the outburst you just witnessed. You know that this is a very serious matter and that nerves are almost frazzled. So I am sure they apologize for any emotional outbursts that they showed to you." (Tr. 875). Thus, the jury was aware that the prosecutor should not have acted so emotionally. Moreover, the defense stated that it was satisfied with the admonition. (Tr. 877). As such, the court reasonably handled the situation.

¶{49} The next instance raised by appellant here is that while cross-examining appellant, the prosecutor told him to stop looking at his counsel. (Tr. 919). The defense objected, the court sustained the objection, and the court instructed the jury to disregard the prosecutor's comment about appellant looking at his attorneys and to not consider the comment for any matter. (Tr. 919). We presume that the jury followed the court's curative instruction. See *State v. Garner* (1995), 74 Ohio St.3d 49, 59.

¶{50} Appellant then complains about various parts of the prosecutor's closing arguments. He complains that the state implied either that appellant confessed or that he exercised his right to post-arrest silence. Specifically, the prosecutor surmised: "If

Detective Mercer was going to lie, how easy would it have been for him just to have said, yeah, when we arrested him, he confessed. He didn't try to do that. He didn't try to add anything." (Tr. 971). The defense objected on the grounds that this crossed the line of suggesting either that the defendant confessed or was an improper reference to post-arrest silence. (Tr. 971-972). The prosecutor responded that he was merely stating that the detective was credible. (Tr. 972). The court overruled the objection but asked the state to "[s]tay away from the word confession." (Tr. 973). Contrary to appellant's argument, the state was not suggesting that appellant confessed or suggesting that he must be guilty because he did not deny the acts post-arrest. Clearly, the comments dealt with the detective's credibility. Thus, appellant's particular argument here is without merit.

¶{51} Two other times in closing, the prosecutor stated that appellant admitted the aggravated murders. (Tr. 980, 987). The second time, the defense objected on the grounds that appellant admitted to purposely pulling the trigger, not to prior calculation and design, and thus, the most he admitted was murder (albeit in conjunction with self-defense). (Tr. 987). The court sustained the objection and asked the defense what remedy they proposed. The defense responded, "I just want you to say the objection's sustained, his last comment will be stricken, and then he can go into [it] if he wants to [clarify.]" The court then announced that the objection was sustained and instructed the jury to disregard the prosecutor's comment. (Tr. 988). The state then explained that appellant did not admit prior calculation and design but only admitted that he purposely caused the deaths. (Tr. 988-989). Thus, the error was remedied in the manner asked by the defense.

¶{52} Appellant also takes issue with the prosecutor's characterization of his defense in a manner that denigrated him and his attorneys. For instance, the prosecutor recapped the videotaped interview of Helen's daughter arguing that she stated that her mother tried to pull up, not that her mother tried to run him over. The prosecutor then stated, "The defense is trying to twist words, manipulate an 11-year-old. They're relying on two words being transposed for their defense. Give me a break. She's 11 years old." (Tr. 961). Absent the manipulation comment, the statement is a proper comment upon the evidence. See *State v. Hill*, 8th Dist. No. 80582, 2002-Ohio-4585, ¶35. The manipulation comment, although overly harsh, did

not appear to deprive appellant of a fair trial. See id. (state's comment that defense counsel twisted evidence around did not rise to a level of insinuating that defense counsel was untruthful); *State v. Prysock*, 10th Dist. No. 86AP-492 (substantial rights not affected where prosecutor said defense twisted things around, cooked up some scheme, and threw in "imaginary things.").

¶{53} Thereafter, the state opined that the testimony of Helen's sister may have sounded overly deliberate because she was asked compound questions and "wasn't going to let the defense counsel trick her." (Tr. 966). The defense objected, and the court instructed the state to stop using the word "tricked." (Tr. 967). Where a witness is asked a two-part question requiring the witness to answer yes to one part and no to the other part, it could be considered a strategy to try to "trick" the witness into answering only the last part of the question so that it sounds like the witness is providing the same answer to both parts of the question. The state was trying to explain why the witness may have sounded overly deliberate while testifying and why she was upset on the stand. It appeared the defense was satisfied with the court's admonition to counsel, and it does not appear that the statements were outcome determinative.

¶{54} Appellant also takes issue with the statements: "The defendant is doing what I like to call the spaghetti approach, the shotgun approach. Some people call it the BS approach where you just kind of throw everything out there, hope something sticks, hope you get some – somebody confused in the law." (Tr. 981). These statements were made after the state noted that appellant was raising the affirmative defense of self-defense and in the alternative was claiming that his actions only constituted voluntary manslaughter due to sudden passion or serious provocation. (Tr. 980). However, no objection was entered, and plain error is not apparent. That is, the Supreme Court has allowed the state to describe a defense as "baloney" and a "dartboard approach." *State v. Brown* (1988), 38 Ohio St.3d 305, 317.

¶{55} Finally, appellant complains that the state's closing opined that appellant was lying. (Tr. 985, 1031, 1037). The defense did not object to any of these statements and thus waived all but plain error. See *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6170, ¶181. Moreover, the second and third statements were made in the state's rebuttal when responding to the defense's statement that no one lied, which

opened the door to the state's characterization. (Tr. 991-992, 1031, 1037). See *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶216-217; *State v. Brown* (1988), 38 Ohio St.3d 305, 316-317. Finally, calling the defendant a liar has been found to be harsh but not purely abusive where it is a fair comment on the evidence and where the state's comment underscores its theory of the case that the defendant's version of events is untrue. *State v. Clemons* (1998), 82 Ohio St.3d 438, 452.

¶{56} Attorneys are permitted a certain degree of latitude in summation. *State v. Treesh* (2001), 90 Ohio St.3d 460, 466. Thus, the prosecutor may draw reasonable inferences from the evidence presented at trial, and may comment on those inferences during closing argument. Id. Viewed in its entirety, the state's closing argument here does not deny appellant a fair trial. See id. This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER FOUR

¶{57} Appellant's fourth assignment of error contends:

¶{58} "THE TRIAL COURT DENIED APPELLANT DUE PROCESS UNDER THE FOURTEENTH AMENDMENT DUE TO THE FACT HIS CONVICTIONS FOR AGGRAVATED MURDER WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE JURY AND TRIAL COURT'S VERDICT WERE INCONSISTENT WITH THE EVIDENCE AND TESTIMONY PRESENTED AT TRIAL."

¶{59} Weight of the evidence deals with the inclination of the greater amount of credible evidence to support one side of the issue over the other. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387. In reviewing a manifest weight of the evidence argument, the reviewing court examines the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id. A reversal on weight of the evidence is ordered only in exceptional circumstances. Id. In fact, where a criminal case has been tried by a jury, only a unanimous appellate court can reverse on the ground that the verdict was against the manifest weight of the evidence. d. at 389, citing Section 3(B)(3), Article IV of the Ohio Constitution (and noting that the power of the court of appeals is limited in order to preserve the jury's role with respect to issues surrounding the credibility of witnesses).

¶{60} In conducting our review, we proceed under the theory that when there are two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one should be believed. *State v. Gore* (1999), 131 Ohio App.3d 197, 201. Rather, we defer to the jury who was best able to weigh the evidence and judge the credibility of witnesses by viewing the demeanor, voice inflections, and gestures of the witnesses testifying before it, including appellant himself. See *Seasons Coal Co. v. Cleveland* (1994), 10 Ohio St.3d 77, 80; *State v. DeHass* (1967), 10 Ohio St.2d 230, 231.

¶{61} Appellant states that he did not act with prior calculation and design because the shooting was a spontaneous response to Helen's attempt to run him over. He argues that he was justified in shooting Helen because the car was coming toward him, because he did not create the violent situation, and because he did not violate any duty to retreat. See *State v. Williford* (1990), 49 Ohio St.3d 247, 249 (the affirmative defense of self-defense has three elements: (1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger).

¶{62} However, the testimony established that appellant threatened to kill Helen and her children twenty minutes prior to the shooting, simultaneously expressing that he did not care about the baby. (Tr. 548, 607). At one point, he called his girlfriend and asked her to get his gun. (Tr. 554, 616, 777). One witness heard him tell his girlfriend that the reason he needed his gun was to kill someone. (Tr. 616). The testimony shows that appellant then drove home, approached his girlfriend, and entered his house. A reasonable inference can be drawn that appellant either received his gun from her or retrieved it from the house. (Tr. 490-492, 560). The jury need not believe that appellant had his gun on him all day as he claimed.

¶{63} Appellant then deliberately walked to the vehicle on the street containing Helen and her three children. Helen's daughter testified that he argued with her mother while pointing the gun at her. (Tr. 497). There is some evidence that the car did not move until after the shot was fired. In any event, one could conclude that even if her car moved prior to the shot, she was only trying to escape or to otherwise protect

herself from appellant's gun. A rational juror is not forced to believe that appellant only brandished his gun while running away from a car intent on hitting him.

¶{64} There are two reasonable views of the evidence. That the jury chose to believe a view contrary to that set forth by appellant did not result in a manifest miscarriage of justice. A finding that prior calculation and design existed is not contrary to the manifest weight of the evidence. It was not unbelievable that appellant had a process of reasoning involving a scheme that gave studied consideration to the method of death. See *State v. Moore*, 7th Dist. No. 07MA136, 2009-Ohio-1177 ¶36-38. As such, this assignment of error is overruled.

<u>ASSIGNMENT OF ERROR NUMBER FIVE</u>

¶{65} Appellant's fifth and final assignment of error provides:

¶{66} "THE TRIAL COURT VIOLATED DUE PROCESS AND COMMITTED PLAIN ERROR WHEN IT IMPOSED POST-RELEASE CONTROL FOR APPELLANT'S CONVICTIONS FOR AGGRAVATED MURDER WITHOUT STATUTORY AUTHORITY TO DO SO PURSUANT TO R.C. 2967.28."

¶{67} At sentencing, the court advised appellant that when he is released he will be subject to a period of post-release control for up to five years. (Sent. Tr. 13). The sentencing entry states that the defendant was advised of post-release control at the sentencing hearing. Appellant argues that aggravated murder is a specially classified felony, that post-release control only applies to offenses classified from a first to a fifth degree felony, and that the court thus erred in sentencing (or attempting to sentence) him to post-release control. The state concedes the correctness of this argument.

¶{68} As the parties agree, the post-release control statute applies only to felonies of the first, second, third, fourth, and fifth degree. See R.C. 2967.28(B), (C). Aggravated murder is an unclassified felony whereby the defendant is either ineligible for parole or becomes eligible for parole after serving a certain amount of years in prison. See R.C. 2929.03(A)(1); 2967.13(A). Thus, "[A]n individual sentenced for aggravated murder * * * is not subject to postrelease control * * *." *State v. Clark*, 119 Ohio St.3d 239, 2008-Ohio-3748, ¶35-36. Consequently, the trial court erred in stating at sentencing that appellant was subject to up to five years of post-release control and by attempting to impose post-release control in its sentencing entry.

**¶{69}** Appellant states that we must remand for a new sentencing hearing. The state believes that we choose whether to vacate the post-release control portion of the sentencing entry or that we can remand for a new sentencing hearing before the trial court. On this issue, this court has held:

**¶{70}** "Based on this statutory scheme, the trial court was not authorized to impose post-release control as part of Crockett's sentence. When a trial court imposes a sentence that is unauthorized by law, the sentence is unlawful. *State v. Simpkins*, 117 Ohio St.3d 420, 2008-Ohio-1197, ¶21. An unlawful act is not merely considered erroneous or voidable, but it is wholly unauthorized and void. Id. A void sentence must be vacated, placing the parties in the same position they would have been in had there been no sentence. Id. at ¶22. Thus, the trial court must conduct a new sentencing hearing." *State v. Crockett*, 7th Dist. No. 07MA233, 2009-Ohio-2894, ¶9.

**¶{71}** As we are remanding for a new sentencing hearing by the trial court, we have decided to recognize plain error on a merger issue. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court or this court. See Crim.R. 52(B); *State v. Slagle* (1992), 65 Ohio St.3d 597, 604 (appellate court can sua sponte consider unobjected to errors). Plain error can be recognized to prevent a manifest miscarriage of justice where, but for the error, the outcome of the proceeding clearly would have been otherwise. *State v. Harrison,* 122 Ohio St.3d 512, 2009-Ohio-3547, ¶61.

**¶{72}** Here, the court sentenced appellant to consecutive sentences on all four counts. However, the court found that counts two and three, the counts dealing with the unborn child, merged as a matter of law. Sent. Tr. 13; 05/22/09 J.E. p. 10. Upon this merger, the court was only permitted to sentence appellant to one of the merged offenses. *State v. Whitfield,* 124 Ohio St.3d 319, 2010-Ohio-2, ¶17-18 (when two counts are merged, a sentence can only be entered on one). A court cannot even enter concurrent sentences on merged offenses, let alone consecutive sentences as the court did here. See id. The proper remedy for this error is to remand for a new sentencing hearing where the state shall choose which of the merged counts on which it wishes the court to enter a sentence. See id. at ¶21-25 (state's right to elect which offense should remain for purposes of sentencing on remand); *State v. Fellows,* 7th Dist. No. 09JE36, 2010-Ohio-2699, ¶58.

¶{73} For the foregoing reasons, the judgment of the trial court is affirmed in part, reversed and remanded in part. The case is remanded for a new sentencing hearing where the trial court shall enter a sentence on only one of the two merged counts and where the trial court thereafter shall issue a sentencing entry containing no post-release control.

Donofrio, J., concurs.
DeGenaro, J., concurs.